Council. Good morning. May it please the Court, my name is Katherine Rahm. I'm here for the petitioner NRDC, and I'd like to reserve four minutes for rebuttal. EPA has allowed a pesticide containing nanosilver called AGS-20 to go on the market without considering the serious health risks that that pesticide poses to infants who might chew on fabric containing that pesticide, and also without considering the risks to all consumers from aggregate exposures not only to AGS-20, but also to other nanosilver products that are already on the market. The health risks here are very serious because excess exposure to nanosilver can harm critical organs, including the liver and kidneys. And nothing in this record supported EPA's decision not to consider or acknowledge those risks, and therefore its safety finding is unsupported, and the registration must be vacated. Under FFRA, which is the federal pesticide statute at issue here, EPA has to determine before registering a pesticide that that pesticide will have no unreasonable adverse effects on human health. In order to do that, EPA conducts a risk assessment in which it determines what it will consider a presumptively safe level of exposure to that pesticide. And in conducting that risk assessment, EPA acknowledges that it has to use the most vulnerable subgroup within a population, such as the most vulnerable age group, and that way EPA knows that when it allows the pesticide to go on the market in a certain amount, that'll be safe for all consumers and not just for an average consumer. Here, the record shows that infants are the most vulnerable age group when it comes to exposure to AGS-20, and that's for two reasons. First, infants – there's a study in the record that shows that infants are more likely than any other age group to chew on fabrics that could contain this pesticide, and that's the relevant route of exposure here because oral ingestion causes the highest level of exposure. Second, and this is also in the record, infants have a much smaller body weight than any other consumer, including older children, and that makes them inherently more vulnerable to a pesticide at any given dose. However, here, EPA, with no support in the record, chose to do its risk assessment using three-year-olds in the place of the most vulnerable age group. Not entirely without support. They did in both the preliminary report and in their final report cite to, I think, a 1997 study that said that this was the age group that they had traditionally used to represent infants and children. Your Honor, they do cite to that 1997 handbook when they say they're using the three-year-old body weight in their risk assessment. But my understanding is they only cited to that handbook for the proposition that an average three-year-old weight is 15 kilograms, and not for any support for the proposition that three-year-olds are the most. I believe in the government's brief that they cited some evidence that the three-year-old was a sort of a standard measure that EPA uses in other cases, that it's one that is traditionally used. In their brief, they do say that they often use three-year-olds for risk assessments for non-dietary pesticides and that they've used that in the past. However, the examples they cite in the brief, we looked at those, and there's no explanation in those examples either for why to use three-year-olds. And so there's no support for the idea that ‑‑ What would EPA have to do here? They have to use one-year-olds? They have to use two-year-olds because they're younger than three-year-olds? And then you would come back and say, no, you have to use one-year-olds. And if you have to use one-year-olds, you have to get to six-month-olds, and then five-months. I mean, at what point does this stop? I mean, there's a huge continuum here. Your Honor, we're not trying to dictate any particular age group to the agency here that it should use as the most vulnerable age group. Well, you are trying to dictate to use something less than three. That's exactly right. It has to be less than three, and there's no particular age group. And why? That's because there's a study in the record that shows that, in this particular case, the record shows that one-year-olds are much more likely than two-year-olds or three-year-olds to mouth that. So you are trying to get them to go at least to one-year-olds? Well, there's another factor that sort of goes along with that, which is the body weight factor. And that, of course, increases vulnerability all the way down to zero. And so it would be up to EPA to balance the sort of how they work together, how the increased vulnerability from low body weight works together with increased vulnerability from increased exposure via oral ingestion. But what is clear on this record is that there's no support for three-year-olds. Three-year-olds not only have a higher body weight, but they're also less likely to ingest nanosilver in this case because they're less likely to mouth it. In fact, nobody is going to ingest it unless they chew on the fabric. Isn't that pretty much the case here? That's true. And young children, of course. You know, it worried me as I read this thing, and I thought, yes, there's a risk. I don't know how anybody can argue that there isn't when you describe what happens. But I think, yes. Now, let's see. Do you compare it to other risks that babies are exposed to, or do you just ignore that fact? Let's assume stairs. Babies fall down stairs and break everything. Sometimes their necks. So we say, oh, don't build any buildings with stairs. Don't do this. Don't do that. Do you see what I'm asking you? Can we make everything perfectly safe for everybody under all circumstances? I think I understand your question. And Congress has mandated in this case under FIFRA, which is the Federal Pesticide Statute, that EPA find for any given pesticide, and so here for AGS-20, that it will not cause unreasonable adverse effects to humans. And isn't that the key? Unreasonable. Unreasonable adverse effects, although in this case, EPA didn't actually reach the question of whether it was reasonable or unreasonable. Their decision was premised on the fact that the ---- Let's assume that. Do we have to find it unreasonable? No, Your Honor, because on this record, EPA made its decision on the basis that there were no adverse risks at all, and so it didn't have to balance the risks against the potential benefits of this pesticide, if any. It just decided that ---- Did you raise this point to EPA? Yes, Your Honor. NRDC commented to EPA that it should assess risks to children and infants in its risk assessment. And that is found on page ---- ER-224. Right. I have that right here. Yes. And NRDC noted that ---- Thumb-mouthing of the material is highly likely to occur with infants and young children. The special considerations of the impact of these exposures ---- On children and infants must be incorporated. Exactly. Now, in the draft, in EPA's draft, I believe that they had said they were going to use toddlers and they were going to use the 3-year-olds. And I think that's found on ER-182. So NRDC knew at the time that it raised its objections that EPA intended to use 3-year-olds as its measure. Yes, Your Honor. And by saying children and infants, NRDC alerted EPA to the possibility that children and infants are two different age groups. Not entirely apparent, though, is it? I mean, you didn't ---- you could have added one more sentence that said, we don't think 3-year-olds is the appropriate measure. But it wasn't important enough to NRDC to make that comment? The government wants to say that you forfeit the issue. I want to get beyond the question of forfeiture. I want to get to the ---- I want to get more to the substantive question was you knew that they were using 3-year-olds, but you didn't file any objection at the time. So obviously, it didn't appear to be important enough to NRDC at the time to comment on it. Your Honor, by saying children and infants, NRDC was saying, and this should have been clear to EPA, because this is a first ---- The term that EPA used were toddlers. Now, what's the difference between infants and children? Toddlers and children, as far as I understand, are a little bit more synonymous. But infants are not toddlers, and infants also are not children. There are examples in many EPA guidebooks where they distinguish children and infants. You're not going to tell many mothers that infants aren't children. You're going age-wise. They haven't reached that. In layman's terms, of course, people might think of infants and children, but EPA routinely distinguishes between infants and children as two different age groups. So by using that word ---- And moreover, in this case, choosing the right age group to assess is a first-level issue in the analysis. EPA concedes in its brief that it had to choose the most vulnerable age group when conducting a risk assessment, and that's repeated throughout EPA handbooks and guidances that are in the record. And so this isn't an issue on which EPA should have needed detailed comments from any commenter. This is something that EPA acknowledges that it had to do, and that indeed it claims that it did do. And so the principle of the waiver rule is that EPA, the agency, has to have been given the opportunity to bring its expertise to bear on the relevant issue, and clearly that's been satisfied here. EPA couldn't do a risk assessment without choosing which was the most vulnerable age group, and so the only issue here is whether EPA made the right decision. Moreover, in EPA's response to NRDC's comments, it's rather clear that they 115, EPA responds to the comments, and in doing so, it repeats, it writes out NRDC's own comments. So it writes out NRDC's comments and repeats the fact that NRDC asked them to assess children and infants, and then in EPA's response on the same page right beneath that, it says, well, we assessed risks to children, and we also assessed risks to workers, and we find that those are sufficient to protect adults. And so there's a very conspicuous absence of the word infants, and EPA seems to have wanted to simply write that word out of NRDC's comments, which, of course, isn't permissible. EPA says that they use 3-year-olds traditionally. Is that does that matter? Is that significant? We don't think it is, Your Honor. First of all, they don't always use infants. We have an example in our brief of a pesticide, a rodenticide, for which they assessed risks to 1-year-olds. So it's not as though they always use 3-year-olds. But even in the examples that EPA gives where they do use 3-year-olds, those examples don't say, we always use 3-year-olds, we always consider 3-year-olds the most vulnerable age group. They simply seem to use 3-year-olds as a default. And we're not questioning the use of 3-year-olds in those past risk assessments for all we know based on the particular characteristics of those pesticides at issue there or other parts of the analysis that might have been appropriate for those pesticides. But here on this record, which is what's relevant for this pesticide decision, it was not appropriate to use 3-year-olds. And EPA should have been well aware of that because when they did use 3-year-olds as the vulnerable age group in their risk assessment, they found that exposures to AGS-20 fell precisely on the line between what EPA would consider presumptively safe and what EPA would consider presumptively unsafe. And that means that using infants, as EPA should have done on this record, or indeed using any age group under 3-years-old, EPA would have had to conclude that exposures to AGS-20 fall into the presumptively unsafe level. And that's why EPA's safety findings. Would that also depend on the mouthing versus chewing problem? Your Honor, EPA does say in its brief that there's some distinction between mouthing versus chewing, and it hypothesizes now that 3-year-olds might chew more because it doesn't cite anything in the record for that, and we found nothing in the record that would support that theory. And, of course, agencies can't simply give an explanation in their brief that may or may not support a decision they've made. There has to be at least something in the record that supports that. And here there's nothing. They do have teeth, but it's not at all clear for them. That's true. But they do have hard gums. And also, for instance, on the other side of the ledger, infants have a lot more saliva. So, for all we know, that's a more important factor for extracting a pesticide than teeth. It may not be, and I'm not going to speculate on it, but with the saliva out comes everything that's inside that mouth. Do you see? We have more saliva but less swallowing. Sorry. We may have more saliva but less swallowing. We have more drooling. Right. Maybe we need a drooling study. And the point is, of course, it's not for me or we're not asking this Court to speculate on the relative merits of saliva versus teeth for extracting pesticide for a fabric. EPA had to do that. And on this record, they did nothing of the sort. They used 3-year-olds as a default. They only cited to that 1997 handbook to support the idea that that was a, that 15 kilograms was. I want to say that there's nothing. In your view, they didn't do enough, but they did quite a bit, didn't they? Your Honor, we don't see anything. We think they used 3-year-olds as a default age group, perhaps because they've used 3-year-olds in the past, but without realizing that in this case that was actually determinative in making the safety finding because of the fact that using 3-year-olds resulted in a risk exposure that was directly on the line between safe and unsafe, such that a lower body weight in the same calculation would have made the exposure unsafe. We may disagree on what the record shows, but I think the pesticide, if we want to call it a pesticide, I think you referred to it. It is, yes, Your Honor. Isn't used. In fact, the only way the baby's going to be exposed to it so far as this record shows is by chewing on a garment grown, used by a caregiver. Isn't it? That's the main route of exposure because under EPA's own assessments, oral exposures create the greatest dose. So when you say that they didn't do anything, you stretch it because they did do something. They narrated to that so that you could make that statement. Yes, we agree that EPA assessed risks to toddlers, to 3-year-olds, but they, and they concede this, they have to make sure that the pesticide is safe for all consumers, including younger children. The only place at which the MOE is 1,000, which is where EPA would be most vulnerable in the study, has to do with applications on surface coating as opposed to those that are incorporated into the fibers. Do we have any evidence in the record as to what percentage of garments will be treated surface coated as opposed to incorporated in the fibers? That's not in the record, Your Honor. We don't know whether that's more common in tents or blankets or? No, I don't know, and it's not in the record. Would you turn to the aggregation question? Yes, of course. So the second flaw that EPA made in registering this pesticide was that it didn't consider the risks to all consumers from exposures both to AGS-20 and to other nanosilver-containing products that are already on the market. And aggregate exposures are important because multiple sources of exposure to the same pesticide can combine in a person and magnify the toxic effects of a given chemical. And so in this case, EPA should have considered whether, given other nanosilver products on the market, adding AGS-20 as another nanosilver product would have had a harmful effect on consumers. EPA's decision in this case, again, because their decision for toddlers and thus for all consumers was right on the line between what was safe and unsafe, their decision to register AGS-20 had to be based on the assumption that not a single other nanosilver product on the market contains nanosilver that's similar enough to AGS-20 to be aggregated for a risk assessment. And that, again, as with infants, that assumption is simply not supported by the record. And in fact, it's contradicted by the record. There's evidence in the record that there are actually registered products on the market that contain nanosilver that are similar to the nanosilver contained in AGS-20. And in fact, in EPA's response to comments on this very issue, they seem to suggest that they acknowledge there are many other nanosilver products already on the market. So in the face of that evidence, it was clearly unreasonable for EPA to premise its safety decision and, in turn, to premise the registration of this pesticide on the completely unfounded and contradicted assumption that there's not a single other nanosilver product on the market. What are the other products? They're listed, actually, in the supplemental excerpts of records submitted by HYCU. The ISER pages 68 to 75, and those include water filters and algicides. Okay, but as I look at water filters and algicides, I'm just wondering, what is the risk to infants? Because that's the one place where they're vulnerable. If you get over to workers, HYCU was prepared to, you know, put on masks and protected clothing and other things, and the numbers go way up, the MOE goes way up. So the only place that EPA is really vulnerable and where you've attacked is on the question of infants. So what is the risks of infants getting a hold of water filters or algicides? Your Honor, two things. First, for this argument, it's not just infants because EPA made this assessment for toddlers, so this would be unsafe for toddlers, and then presumably for other consumers because EPA used that assessment for all consumers. But there is a risk that toddlers, infants, and all consumers will be exposed to these nanosilvers because my understanding is that these water filters are used in domestic applications. So, you know, everyone obviously is exposed to domestic drinking water, including young children. And the algicides, again, my understanding is that they're used in swimming pools, and so even young children could be exposed to that. And, again, for this aggregate risk assessment, that's a harm to 3-year-olds as well as other consumers and not just to infants. And, in addition, this argument also wasn't waived. Of course, EPA doesn't contest that here, but HiQ does, but this was raised specifically by another organization, the Environmental Working Group, that told EPA that they should consider aggregate risks to all nanosilver products on the market, and otherwise it could jeopardize human health. And unless the Court has further questions, I'd like to reserve the remaining time for about a minute. Thank you, Ms. Rom. Thank you very much. Good morning, Your Honors, and may it please the Court. My name is Matthew Hendrum, counsel for Respondent United States Environmental Protection Agency. With me at counsel's table is Amber Aranda from EPA's Office of General Counsel. In addition, counsel for intervener HiQ Materials AG will be arguing for five minutes in support of EPA. Your Honors, there are three primary points I'd like to discuss with you this morning. First, EPA submits that NRDC lacks standing because it has not met its burden of proving that it faces an imminent rather than speculative injury from AGS-20 entering the market. Second, EPA's conclusion that the registered uses of AGS-20 will not cause any unreasonable adverse effects was based on the agency's technical expertise in conducting risk assessments under FFRA and warrants substantial deference from this Court. Third, in its risk assessment, EPA reasonably determined that 3-year-olds are the most vulnerable subpopulation to exposure from AGS-20, and NRDC has waived the argument that infants are the more vulnerable subpopulation. Further, EPA reasonably determined that it could not aggregate exposure to other potential sources of nanosilver because it had no scientific data on which to do such aggregation. Let me turn first to standing. In order to demonstrate standing, a petitioner must prove that it has suffered an injury that is actual or imminent, which the Supreme Court has clarified must be certainly impending and immediate, not remote, speculative, conjectural, or hypothetical. I believe the Lyons case illustrates the burden that a party must meet to prove that a threatened future injury is imminent. What Lyons shows is that even where — Lyons dealt with chokeholds in Los Angeles. That was police action. We've got affidavits in the record from parents who said, look, we're very concerned about this. We are parents of young children. We have caregivers. Here are our concerns. And this is a question of being able to protest a rulemaking, and the standards for standing are just not that high. This is not like the Supreme Court's prior cases in which we're saying, well, I'm affected by elephants in Sri Lanka. This seems to be, you know, pretty direct. It doesn't take very much here, counsel. You can spend your time wherever you want, but it doesn't look like there's very much here. The point well taken, Your Honor, but I do think that, you know, the Supreme Court has emphasized the importance of the imminence requirement, and I think that if you take a look at NRDC's declarations, I think what they show is that they have children who mow the objects that are out of their parents' control for certain periods of time, and that there are third parties, such as caregivers, who are in control of their children for periods of time, infants for periods of time, and really nothing more. So I think NRDC does raise a speculative possibility. I think they certainly do have a greater than zero, but it is speculative evidence. But these are also particles you can't see, and so the risks are increased when you can't tell what it is that you're trying to avoid. I think here, though, the exposure route is important, Your Honors. These are treated textiles, and so I think at least three conditions need to be met for there to be an exposure. First of all, somebody has to choose to purchase a product treated with one of these textiles. Are these products going to be labeled? Are they going to come with like a surgeon general's warning on them that says this contains nanosilver? There isn't anything specifically in the record, Your Honor, that discusses what sort of labeling might be on the products when they're ultimately sold. But these are unique products. They have antimicrobial characteristics. We're talking about clothing. We're talking about fabric. It could be almost any place. And unless EPA has said you're going to have to put a warning label on there, or unless HYCU decides to label its products, maybe HYCU can tell us whether it's going to label them and put some kind of a warning that says, warning, this contains nanosilver, then parents are going to have a very difficult time knowing which products to avoid. And if you've got caregivers, it's not the kind of thing that you can go and say, okay, I'm dropping the kid off at daycare, but I'm only dropping them off at a place where I can be sure that they don't have any nanosilver on their products. Well, I think, Your Honor, in order to kind of prove a more concrete harm here, I think NRDC could have at least asked the caregivers whether they would be willing to avoid exposure. In terms of these sort of products, we don't have any evidence in the record that NRDC even went that far. For rulemaking, it doesn't take very much to get standing to be able to protest this. Well, a point well taken, Your Honor. I do submit that NRDC has not proven a more than speculative harm, but I will move on to my second point and ask that you take a look at our arguments in the briefs and NRDC's declarations. To my second point, EPA's determination that the uses of AGS-20 would not result in any unreasonable adverse effects was amply supported by a conservative risk assessment that warrants substantial deference from this Court. Now, the overarching issue that EPA had to consider in its risk assessment was whether consumers could be exposed to sufficient quantities of nanosilver from products treated with AGS-20 such that adverse health effects could result. Now, under EPA's binding use restrictions, and these are legally binding and enforceable, there's only a finite amount of silver that could be incorporated into any given finished textile. For example, where a product is treated with AGS-20 as a surface coating, the finished textile can contain no more than 0.002 percent of silver by weight. Now, starting with this, there's a very small amount of silver that can be in one of these products. Starting with these binding use restrictions, EPA then makes numerous conservative assumptions about the potential exposure that consumers could face from products treated with AGS-20. First of all, EPA assumes that any silver that could be released from a textile treated with AGS-20 would be released in the form of nanosilver, even though EPA has no definitive evidence that nanosilver can be released from a product treated with AGS-20, and in fact, HYCU has consistently maintained that no nanosilver is released. Second of all, EPA then estimated the potential amount of silver that could be released from a given textile based on the most aggressive leaching study, which indicated that up to 35 percent of silver could be released. So EPA assumed, based on this study, that 35 percent of the silver contained in a textile that is either treated or chewed could be released as nanosilver. EPA repeated throughout its document that it used very conservative estimates, but isn't that reflected in the MOE that they come up with? Aren't those assumptions then into the MOEs that they come up with? And one of your lines is 1,000, which is your action level. Well, the MOEs speak to the uncertainty in the data set. So when EPA conducts a risk assessment, there are really two issues. It's where do the adverse effects result from exposure, and then how much potential pesticide could they be exposed to. So the MOE goes to the fact that there was uncertainty from extrapolating from animal studies. But 1,000 is the EPA's action level, right? That is correct in this case, because they applied three uncertainty factors. And under EPA's own assumptions, which it said were very conservative, it did come up with an MOE of 1,000 for one measure, which dealt with toddlers. Yeah, for the aggregate exposure. EPA did come up with 1,000. And I can move to the aggregate point if you'd like me to move to that point. Either the aggregate or the toddlers. I'd like to hear on both of those, and I think that's where the NRDC has focused its attention. I think that I'd like to hear the government's response to that. Sure. Well, why don't I just start with the aggregate exposure? NRDC attempts to undermine EPA's risk assessment based on that aggregate argument, as you just mentioned. However, FIFRA does not require aggregation in a risk assessment, and it neither specifies or requires when aggregation would be appropriate. NRDC does not point to any legal authority that EPA was required to aggregate in this case. And EPA reasonably determined that it could not aggregate to exposure from these other potential sources of nanosilver because it lacked any scientific data indicating that those sources of nanosilver contained nanosilver that was chemically similar to AGS-20. Now, this is important because EPA's scientific advisory panel cautioned that only particles of a similar size and essentially identical properties can be assumed to have similar health impacts. In this case, EPA was aware that there are claims being made that other products contain nanosilver that are on the market. But EPA has absolutely no scientific data that it could incorporate into a risk assessment on which to judge whether those products are, in fact, the same. EPA doesn't do these risk assessments based on speculation about what products might contain. It focuses on what the data that it shows, that it has showed. Now, in addition, although EPA did not aggregate to other sources, potential sources, EPA did do a very conservative aggregate assessment, assuming that a three-year-old could be exposed to both thermally and orally at the same time. Now, what that assessment involved was that a three-year-old would be simultaneously wearing a treated textile while also chewing a treated textile at the same time again. And EPA then assumed that 35 percent of the silver in the textile being chewed would be orally ingested as nanosilver, while at the same time, 35 percent of the silver being worn in the textile being worn would be absorbed as nanosilver. So this is a highly conservative aggregate analysis. And I think, to your point, Judge Bybee, I think it goes to that even though EPA was on the exact MOE for this aggregate calculation, given this conservative aggregate calculation that it did do in addition to these other conservative assumptions that it incorporated in regarding the potential for being exposed to nanosilver, that EPA did not feel that it had a risk concern and there was no reason to be required to aggregate. EPA points out that it just doesn't have any studies. It just doesn't have any evidence. It suggests that the evidence doesn't go one way or the other. It's just an absence of evidence, which raises a really interesting question about who has to bear the risk here and what kind of risk we're to assume. HYCU is now responsible for conducting additional studies before EPA will give final approval to this product. Will those studies fill that gap? Are these studies that can feasibly be conducted? Or is this just a gap in the scientific record and we just have to wait until the end of the world? No, we don't have to wait until the end of the world. Actually, EPA is taking active steps right now to try to fill that gap. And there are a couple of processes under FRIFRA through which EPA can fill that gap about what the chemical characteristics are of other products on the market. One of them is called the data calling process. If those studies can be conducted, does EPA have to conduct those studies before it can give provisional approval here? EPA does not, assuming that it can make the no unreasonable adverse effects finding. And in this case, it found that it had. How can it do that when it has unknown risks? It does that by things like using those uncertainty factors where, you know, it acknowledges that there was data, a lack of full toxicity data in the database, and so it applied a tenfold factor of uncertainty to that. It applies a tenfold uncertainty factor to the- You're suggesting that the MOE has already incorporated some mathematical factor for the unknown data. That's exactly right, Your Honor, yes. And in this case, EPA found that based on its examination of the public literature that included studies about nanosilver that was essentially the same size and physical properties as what's in AGS-20, that EPA could identify those levels at which adverse effects may result and then extrapolate from there and then compare that to the estimated exposure that consumers might get from products treated with AGS-20. And based on that, EPA- And again, those were very conservative risk assumptions about what a consumer could be exposed to in terms of the amount of nanosilver from this product. And based on those conservative assumptions, EPA was able to make this no unreasonable adverse effects finding. Now, as part of the conditional registration, certainly EPA will- is requiring further studies from IQ regarding AGS-20. EPA is also, like I said, actively seeking information- Shouldn't they have done what- this additional testing that they could have done before the conditional registration? EPA found that it did not need to because it had sufficient scientific data and then enough- I thought you said there was nothing. No, there isn't nothing, Your Honor. That's how they derive- again, they derive two different- there are two kind of aspects to the risk assessment. One is at what point- at what quantity will nanosilver, like what's in AGS-20, result in adverse health effects? And based on that, EPA relied on public literature studies and was able to conclude that it could- it had scientifically valid in its technical expertise opinion that it could conclude when and at what quantities those exposure to chemically similar nanosilver would result in adverse health effects and then applied those uncertainty factors to come to a more conservative approach on those issues. And NRDC does not challenge EPA's basis for relying on those scientific studies to find that no observed adverse effects level. I can move to the three-year-old issue unless you have any more questions on the aggregate. First of all, NRDC contends that EPA erred in not conducting its risk assessment using infants rather than three-year-olds, as we heard. And EPA submits that NRDC has waived that argument. The argument- Let's get beyond the waiver. I'd like to get right to the three-year-old question. Sure. And move beyond waiver, please. Sure. Well, even if we're going to go beyond waiver, EPA would submit that NRDC's- that EPA reasonably determined that three-year-olds are the most vulnerable subpopulation. Is there anything in the record that shows why they made that- that supports that? What's it- what in the record supports that? Well, I think, first of all, as Serge Briby mentioned, that we do have a longstanding practice. EPA has a longstanding practice of using three-year-olds in its risk assessments for, you know, textiles, treated textiles and other materials that have exposure patterns that are very similar to what we're dealing with from AGS-20. So this is a presumption that EPA has developed over time based on its institutional expertise in conducting these types of risk assessments, and that's a strong presumption. You know, it's based on EPA's reasoning and science. Then there's the leaching studies that EPA looked at in this case, which indicated that the highest potential release of nanosilver from these treated textiles would come through chewing. Now, because three-year-olds have a developed ability to chew, EPA found that this supports their use of three-year-olds in this case, and as EPA said in the record at ER-31, quote, three-year-olds were- three-year-olds, quote, were the likely most vulnerable subpopulation from chewing on and wearing textiles treated with AGS-20. What's the reference on that? ER-31. So to your point, Your Honor, I think EPA, we conceded in our brief that EPA did not provide a highly detailed explanation on this point. But I don't think that's the standard that the law requires under the substantial evidence standard of FIFRA. What we can do is look at EPA's record and discern the agency's reasoning on this point. And I think that's particularly valid where, even though Judge Bybee asked to not talk about the waiver argument, I think it's clear that NRDC says something very different in its brief than it says in its comment. And frankly, the agency had no reason, based on that comment, to think that a highly detailed explanation on this point was required. If you have any further questions, Your Honor, please ask those. I will yield to Intervener Haikyu. That's fine. Why don't we hear from Haikyu. Thank you, Your Honors. Mr. Schatz. Good morning, Your Honors. May it please the Court, Benjamin Schatz of Matt Phelps and Phillips for Intervener Haikyu. Focusing quickly on the waiver point, Judge Bybee, I think you've zeroed in on the shell game that goes on here in these administrative proceedings. The NRDC's comments never focused on infants as a group. It's buried in the comments. It's not in the summary or the conclusions. The comment never talks about caregivers and infants suckling, you know, from the caregivers in the daycare. I mean, all of this is sort of a new theory. And what happens here is whatever group the EPA fix upon, the activist group turns around and says, oh, but you didn't look at pregnant women. You didn't look at the elderly. If you looked at 3-year-olds, you should have looked at 2-year-olds. And if you looked at 2-year-olds, you should have looked at 1-year-olds. And so because the comment was not specific and particularized the way it should be, there should be, this Court should find that there's been a waiver here. You know, the difficulty with the waiver argument, and I suspect that's why I haven't discussed it with my brother, but I assume the reason he said move past the waiver argument, because you make the waiver argument, we're here where we can rule, and we're going to rule, all right, put it out there. And then we find out, uh-oh, a lot of babies are going to suffer. Well, Judge Ferris, the point that you made a moment ago about how the EPA has done a lot here is absolutely right. There's been a lot of investigation on this. This product's been explored for over 3 years, and that's far more than the usual sort of approval that would have been. The only point I was making is, please, go ahead with it. Don't rely on waiver. That's all I was asking. I understand. I understand. And Judge Bybee also amplified that point, that there's going to be continued studies, and there's a schedule for that, and that's on track. On the aggregation point, I just want to make clear that this argument is premised on an unfair contradiction. There's a catch-22 going on here. The reason that comments were allowed and that we're here today is because the scientific advisory panel of the EPA said that this particular antimicrobial is not like other nanosilvers, and because it's different, it needs to be looked at in this great detail. If you want to get to aggregation, for that to make any sense, it has to be the same. And if it's the same, then this would have been a Me Too registration, and there wouldn't have been comments. So there is some circular reasoning going on here, and it's high Q that suffers in the middle because of it. On the merits standing alone, you know, the standard of review here is substantial evidence. It's highly deferential. And it's not just even the EPA involved here. It's the scientific advisory panel that was brought in to specifically look at these points. So I think there's a lot more deference even than the usual deference that needs to be applied here. And finally, I guess to Judge Bybee's comment on the labeling, I would point out that high Q is in the business of, or would like to be, is selling the coating material. It doesn't make the garments. It licenses the use for the fabrics. Is there any evidence that, you know, the downstream producers of the garments incorporating AGS-20 into their garments would be putting a warning on there? I'm not sure. I saw there were some labeling things in the administrative record. But is there anything? EPA wasn't requiring anything, was it? I'm not sure. I don't think so. We have no reason to believe the surgeon general is involved or the FTC or somebody else involved. No. So it would only be somebody sort of trying to prevent a lawsuit or something else that would say, you know, parents, you know, you should be aware that it includes AGS-20, which of course will not mean anything to anybody except for those present in the courtroom today. Right. Well, actually, the idea here is that because this is an added feature of the product, it would be revealed maybe not so much as a warning but as part of the advertising of whoever's buying this product to make these higher quality fabrics. It's going to be called something else besides AGS-20. It's going to be called, you know, super coating that makes you not stinky. And that's very different from saying this contains nanosilver that you don't want to let your infants chew on. Right. Although, as the declarations from the NRDC folks indicate, you know, people who care about this and want to avoid it will do that. And I think that that also undermines their very standing to be here. Thank you, Your Honors. Okay. Thank you, Mr. Shatz. Ms. Rom, you've got some time reserved. Thank you, Your Honors. On the labeling point, you're right. There's nothing in the record, and we've seen nothing to suggest that labeling would be required here. And even if the sellers of products containing AGS-20 wanted to advertise it in some way, there's absolutely no indication they would do that by using the words AGS-20 or nanosilver. And on HYCU's website, they suggest that this be called something like pure by HYCU. And so if you saw a T-shirt that had a label that said pure on it, you would, of course, have no idea what that meant or what that contained. EPA's counsel spoke a little bit about how they use many conservative assumptions in coming to this risk assessment, and that's simply not relevant to the issue. Isn't it relevant to this extent? That is, that if EPA has taken into account what it doesn't know as one of the factors in the MOE, then in some way it's accounted for that risk. And EPA has said in numerous places it adopted a number of very conservative assumptions, and that certainly could have led to the MOE that it's got. In other words, the MOE may have incorporated assumptions about what it doesn't know about aggregation. That's true, Your Honor, but taking the infant argument, for instance, EPA made all these conservative assumptions, came to the conclusion that 1,000 was the decision point, as you said, and then decided to register this product because it found that risks would not be below 1,000. But in fact, if it had used the correct age group in those calculations, it would have been below 1,000. And there's nothing to suggest in this record that EPA would have said, well, even though we said it was safe because it's above 1,000, we still think it's safe even though it's below 1,000 because we were so conservative on these other measures. There's nothing to indicate, in fact, it indicates the opposite, that if it was below 1,000, they would have taken additional measures to make sure that it was above the finding of presumptive safety. And so that's what we have here. EPA's counsel also mentioned that FIFRA does not require aggregation expressly, and they make this argument in their brief as well. And FIFRA does not have a requirement that EPA do an aggregate assessment in every single case, no matter what, the way another pesticide statute, the Food, Drug, and Cosmetic Act, does. However, FIFRA does require EPA in every case, in every pesticide registration, to make sure that that pesticide will have no unreasonable adverse effects on consumers. And in this case, because of the unique circumstances here, including the fact that EPA found the MOE was directly on the line between presumptive safety and unsafety, that meant that it had to take into account some aggregate risks. There is evidence in the record that there are other nanosilver-containing products on the market. And so for EPA to simply discount those risks to zero and to have that assumption, which is unsupported, be determinative in its safety finding here, was unreasonable. And so under FIFRA, that is not allowed because it doesn't satisfy Congress's mandate. Do we owe more deference because of the scientific advisory panel? That was a point that was made by counsel for IQ. Your Honor, in general, we don't think deference is owed to EPA on these two issues, precisely because there's nothing in the record that supports them here. There's much less evidence of conflicting studies or anything where EPA would have to exercise technical or scientific expertise and balance things like that, and where otherwise deference might be warranted to an agency. Here we have nothing but default assumptions with no support in the record,  and so that's not a situation where deference is warranted, even if the standard in general is deferential. EPA also mentioned, EPA's counsel also mentioned that... Counsel, you're well over your time. Oh, I'm sorry. You may wish to wrap up. You're right. I'm sorry. I didn't notice that, and I appreciate the court's time. I'm happy to answer further questions. I think we're good. Thank you very much, Ms. Rom. We thank both counsel. The case was very well briefed and very well argued, and we appreciate your efforts today.
judges: Adelman, Farris, Bybee